# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF VIRGINIA
# ABINGDON DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) Case No. 1:13CR00010-005 |
| v. | ) **OPINION AND ORDER** |
| | ) |
| LORI ANN DUNCAN, | ) By: James P. Jones |
| | ) United States District Judge |
| Defendant. | ) |

*Ajay J. Alexander*, Special Assistant United States Attorney, Abingdon, Virginia, for United States; *Brian Jackson Beck*, Assistant Federal Public Defender, Abingdon, Virginia, for Defendant.

In this Opinion, I resolve sentencing objections by the defendant relating to her advisory guideline sentencing range and restitution obligation.

I

The defendant, Lori Ann Duncan, pleaded guilty without a plea agreement to a two-count Indictment charging her in connection with a scheme to pass false checks. Count One charged her with participating in a conspiracy, in violation of 18 U.S.C.A. § 371 (West 2000); Count Two charged her with the substantive offense, in violation of 18 U.S.C.A. § 514(a)(2) (West 2000). In advance of her sentencing, the defendant has objected to the loss amount attributed to her for scoring purposes under the U.S. Sentencing Guidelines Manual ("USSG"), as well

as the application of a four-level increase in her Offense Level for serving as an organizer or leader of the scheme. In addition, she has objected to the amount of restitution sought by the government. A hearing has been held on the objections and they are ripe for decision.

The basic facts of the case are undisputed. The charged conspiracy included at least 72 persons, all of whom are named defendants in this case. In 2012 and early 2013, hundreds of phony checks were cashed at Wal-Mart stores in this judicial district and in adjoining Tennessee. These checks were counterfeit Comdata Comcheks. "Comcheks" are a product of Comdata Network, Inc., a Tennessee company, and are used primarily by trucking companies to assist their truck drivers in accessing needed funds while traveling. As has been described, the normal and legitimate procedures for the use of these checks are that

> Comdata issues a "security password" to a subscribing trucking company. When a company needs to transfer money to a driver, it contacts Comdata, identifies itself using the password, and authorizes the particular transfer of funds. Comdata then issues an "electronic express code" and authorization to transfer the money. The company tells the driver the code and amount of money authorized. The driver picks up Comcheks at participating businesses (usually truck stops); fills in the code, amount, and payee (usually the driver); activates the Comchek by contacting Comdata and providing the serial number of the Comchek, the code number, and the amount; and then cashes the Comchek, which is treated like a personal check. The merchant cashing the check must first call Comdata to obtain authorization, to confirm that the check has been activated, before cashing the check.

*United States v. Hammonds,* No. 1:13CR00010-032, 2013 WL 2443997, at *1 (W.D. Va. June 5, 2013) (quoting *United States v. Tanksley,* No. 93-6346, 1994 WL 502659, at *1 (6th Cir. Sept. 14, 1994) (unpublished); *see also United States v. Stafford*, 136 F.3d 1109, 1111 (7th Cir. 1998) (explaining Comchek system). As disclosed in this case, it turned out that employees in certain Wal-Mart stores, and in particular a store located in Bristol, Virginia, would cash checks with fictitious codes without first obtaining authorization from Comdata. Wal-Mart suffered a total monetary loss of over $90,000, although most of the defendants participated in the scheme by cashing only a few checks.[1]

In the Presentence Investigation Report ("PSR") prepared by a probation officer to assist the court in sentencing the defendant Duncan, her role in the offense was described as follows:

> The investigation revealed that Lori Duncan did not cash any of the fraudulent checks herself; however, video surveillance indicated that she did in fact accompany at least 10 individuals into Walmart in Bristol, Virginia. Numerous interviews have confirmed that she was also responsible for recruiting or causing to be recruited at least 18 other individuals into the check cashing scheme. However, the investigation indicated that Duncan was involved in the conspiracy as early as November 15, 2012, with Tina Gillett. While the probation office believes that it is probable that Duncan did not have knowledge or involvement with every member of the conspiracy from that point

---

[1] As the scheme progressed over time, the amounts of the individual checks gradually decreased, perhaps because of an effort by the perpetrators to avoid detection. The first checks were in amounts of $400 to $500, while at the end the checks cashed were all for $49.99. (Gov't Ex. 2, ECF No. 1078-3.)

forward, the probation office believes that it was reasonably foreseeable to her that this illegal activity was continuing by Gillett and others, even after Duncan had essentially branched off to operate her own sector of the conspiracy. Therefore, the loss amount attributable to Duncan is $71,448.27, which is the amount of fraudulent checks in the conspiracy from November 15, 2012.

(PSR ¶ 13.)

Tina Gillett, mentioned in the PSR, was the instigator of the scheme.[2] She had previously dated a truck driver and learned about Comcheks from him. She engaged others to assist her in actually cashing the false checks by promising to pay them a small portion of the proceeds for their efforts. She reported that the scheme "got out of hand" when those whom she had recruited began enlisting other people into the conspiracy. According to the government, at least 17 of the 72 defendants other than Tina Gillett, including defendant Duncan, recruited other coconspirators.

Gillett testified for the government at the present hearing on Duncan's objections and related that she and Duncan had been friends and drug users together and that the main purpose of the scheme had been to obtain money to buy drugs. She explained the scheme to Duncan and beginning November 15, 2012,

---

[2] The government refers to Gillett as the "mastermind" of the scheme, but clearly it did not entail much skill or intelligence to formulate and carry it out, in light of Wal-Mart's inexplicable failure to obtain the proper authorization from Comdata before cashing the checks. On the face of each check there is a printed warning in large and bold letters, "DO NOT CASH BEFORE CALLING," along with the toll-free telephone number. (Gov't Ex. 1, Trial of Codefendant Phillip Potter, June 10, 2013, ECF No. 843-1.)

Duncan arranged for other people to cash checks, after which she would bring the cash proceeds to Gillett.³ Shortly before Christmas of 2012, Gillett learned that Duncan was recruiting people to cash checks without Gillett's knowledge and keeping the proceeds herself. Thereafter, they did not work together.

The parties have presented evidence and argument as to the objections, which are ripe for decision. The government has the burden of proving application of the contested sentencing factors by a preponderance of the evidence. *See* Thomas W. Hutchison, et al., *Federal Sentencing Law and Practice* 1869-71 (2013).

II

The PSR recommends and the government contends that the defendant's Offense Level be increased by eight levels, because the total amount of loss was greater than $70,000 but not more than $120,000. *See* USSG § 2B1.1(b)(1)(E) (2012). The defendant argues that the loss amount should instead be fixed at $17,712.48, which she says represents the amount of checks supervised by her up until December 24, 2012, when she and Tina Gillett had their falling out. At that

---

³ Gillett had also procured the cashing of false Comcheks in July of 2012, before the defendant joined the conspiracy, but the government does not contend that Duncan should be responsible for those amounts. Gillett testified that she had had an "attack of conscience" after the July checks, but she had "got[ten] back on pills again" and had resumed the scheme in November.

figure, the guideline increase would be only four levels. *See* USSG § 2B1.1(b)(1)(C) (2012).

The defendant's argued loss amount is based upon a calculation made by defense counsel's investigator utilizing the government's discovery material. It includes only (1) those false checks cashed by codefendants where the defendant also appeared in the Wal-Mart surveillance video at the same time; and (2) those checks cashed by persons whom the government represented at the defendant's change-of-plea hearing to have implicated her. (Richardson Decl. ¶ 4, July 10, 2013, ECF No. 1050-1.)

In contrast, the government introduced at the hearing on the objections the testimony of its case agent and produced through him an exhibit showing that all of the false checks cashed by the codefendants beginning November 15, 2012, totaled over $70,000 (Gov't Ex. 2, ECF No. 1078-3), as well as an exhibit showing that the checks cashed by those directly recruited by the defendant or recruited by those whom she recruited totaled over $30,000 (Gov't Ex. 3, ECF No. 1078-4). The defendant does not contest these calculations, although she denies their relevancy.

In order to properly calculate the advisory sentencing range in this case, the court must make a "reasonable estimate of the loss." USSG § 2B1.1 cmt. n.3(B) (2012). Actual loss is defined as "the reasonably foreseeable pecuniary harm that resulted from the offense." *Id.* cmt. n.3(A)(i) (2012). In determining a specific

offense characteristic such as amount of loss, where the defendant's participation is undertaken with others as in a conspiracy, the court must consider "all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity." USSG § 1B1.3(a)(1)(B) (2012). In other words, "The conduct of others that was both in furtherance of, and reasonability foreseeable in connection with, the criminal activity jointly undertaken by the defendant is relevant conduct . . . ." *Id.* cmt.

I find that all of the false checks cashed after November 15, 2012, no matter by which coconspirators, and the resulting loss, were reasonably foreseeable to Duncan. The evidence shows that she was deeply involved in the execution of the scheme and played a major role in recruiting others to join. Because of the simplicity of the scheme and the fact that Duncan was aware of other organizers who were recruiting check cashers, she reasonably would have anticipated the amount of loss actually suffered at the hands of persons she did not recruit herself or even know.[4] If the check cashers she set in motion were able to defraud Wal-

---

[4] The ringleader Tina Gillett testified without contradiction that the defendant was aware of the activities of two of the other organizers working with Gillett — Buren Jess Cook and Amanda Mosley — who both recruited numerous check cashers. I credit this testimony based upon its consistency with other evidence. Gillett and the defendant were personally close, at least at that time, and Cook and Mosley were frequently present at Gillett's home.

Mart out of over $30,000 in the span of less than two months, it would have been clear to her that the entire scheme would cost the victim over $70,000.[5]

The defendant argues that the scope of her agreement in the conspiracy was only for the checks that she arranged to be cashed and profited from and thus she cannot be held responsible for checks that she didn't know about and had no association with. The only factual basis for this contention is Duncan's agreement at her change-of-plea hearing with her attorney's statement to the court that her "participation in the conspiracy consisted of her, since Ms. Gillett asked her to assist her in passing Comdata checks, and what Ms. Duncan did is she sought the assistance of third parties who were the individuals mentioned by the Government, and Ms. Duncan had those persons cash checks in the Wal-Mart stores, and she did so knowing that the checks in question were fraudulent." (Tr. 2, Apr. 24, 2013, ECF No. 1040.)

It is undisputed that the defendant recruited coconspirators to cash checks solely on her own and separate from any arrangement with Gillett, both before and after December 24. She used the same modis operandi taught to her by Gillett, except that she kept all of the profits, rather than sharing them with Gillett.

---

[5] The government also proved at the hearing that checks in the total amount of $2,959.46 were attempted to be cashed by coconspirators but were rejected at certain Tennessee Wal-Mart stores. (Gov't Ex. 4, ECF No. 1078-5.) Under the Sentencing Guidelines, loss also includes "the pecuniary harm that was <u>intended</u> to result from the offense." USSG 2B1.1, application note 3(A)(ii) (2012) (emphasis added).

In connection with relevant conduct, I must "determine the scope of the criminal activity that a defendant agreed to jointly undertake," USSG 1B1.3 cmt. (2012), and I may interpret such scope "fairly inferred from the conduct of the defendant and others," *id.* I find that the complete uniformity of method, coupled with the defendant's early and extensive involvement in the scheme, permits the inference that the scope of her agreement encompassed all of the false checks passed by her codefendants. *See United States v. Salem*, 657 F.3d 560, 564 (7th Cir. 2011) (holding that factors to be considered in determining the scope of jointly undertaken criminal activity under § 1B1.3 include, among other things, "similarities in modus operandi," "knowledge of the scope of the scheme," and "length and degree of the defendant's participation in the scheme").

III

The defendant also objects to her proposed restitution obligation of $71,448.27, for the same reasons submitted as to the loss amount.

The court is required to impose restitution in this case, pursuant to the Mandatory Victims Restitution Act ("MVRA"), *see* 18 U.S.C.A. § 3663A(a)(1) (West 2000). Because the offense of conviction is a conspiracy, each member is responsible for paying back all losses, "'not only those resulting from the defendant's individual actions but also others caused by the conspiracy itself.'"

*United States v. Newsome*, 322 F.3d 328, 341 (4th Cir. 2003) (quoting *United States v. Laney*, 189 F.3d 954, 965 (9th Cir. 1999)); *see United States v. Plumley*, 993 F.2d 1140, 1142 n.2 (4th Cir. 1993) ("[A] criminal defendant who participates in a conspiracy is liable in restitution for all losses flowing from that conspiracy.").

Even if it were required to be shown that the losses suffered from the counterfeit checks cashed on other occasions by the defendant's coconspirators were reasonably foreseeable to the defendant, I find adequate proof of that fact in this case, for the reasons previously stated. While I am permitted to apportion the total loss among coconspirators to reflect their level of contribution to the loss and their economic circumstances, *see* 18 U.S.C.A. § 3664(f), (h) (West 2000); *Newsome*, 322 F.3d at 341, I find that Duncan's substantial involvement in this conspiracy makes it appropriate to require her to pay the full amount of loss occasioned after she entered into the scheme. I will direct the manner of payment appropriate to her financial situation.

IV

The defendant objects to the adjustment to her Offense Level for the role in the offense. *See* USSG § 3B1.1 (2012). Instead of four levels as an organizer or leader, she contends that she should only be assigned the role of a manager or supervisor and given a three-level adjustment. I disagree.

There can be more than one leader or organizer in any particular conspiracy. USSG § 3B1.1 cmt. n.4 (2012). The Sentencing Guidelines instruct that in distinguishing leadership from mere management or supervision, the court should consider various factors, including the "exercise of decision making authority; the nature of participation in the commission of the offense; the recruitment of accomplices; the claimed right to a larger share of the fruits of the crime; the degree of participation in planning or organizing the offense; the nature and scope of the illegal activity; and the degree of control and authority exercised over others." *Id.*

The government presented uncontradicted evidence at the hearing from coconspirators showing that the larger adjustment is justified. For example, Eric Simpson, a codefendant who cashed two false checks on December 5, 2013, testified that he had been recruited by Duncan and that she had then called Tina Gillett (known to him as "Courtney") and the three of them had gone to Wal-Mart together so that he could cash the checks. Duncan told him that if any questions were asked, he should say that he worked for Gillett at a trucking company. Other defendants variously testified that Duncan had arranged for their participation, filled out the false Comcheks for them to use, received the proceeds, and then paid them for their involvement. I find that it has been shown by a preponderance of the evidence that the defendant acted here as an organizer or leader.

V

For the reasons stated, it is **ORDERED** that the defendant's objections are DENIED.

                                              ENTER: September 11, 2013

                                              /s/ James P. Jones
                                              United States District Judge